UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY BOCKIAN,

Plaintiff,

-v-

BANK OF NEW YORK MELLON CORP.,

Defendant.

24 Civ. 8500 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves claims by a financial services executive against his former employer. For nearly 11 years, before he was terminated in January 2023, Jeffrey Bockian was managing director and head of funding and short-term investments at Bank of New York Mellon Corp. ("BNY"). He brings claims against BNY under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* ("NYCHRL"). He alleges that BNY terminated him based on his age and disability, failed to reasonably accommodate his disability, and retaliated against him for requesting such accommodations.

BNY now moves for summary judgment on Bockian's claims and on its counterclaims, which principally seek repayment of funds BNY disbursed to Bockian. For the following reasons, the Court grants BNY's motion in part and denies it in part.

# I. Background

## A. Factual Background[1]

### 1. Bockian's Employment with BNY

BNY is a financial services corporation headquartered in New York. Dkt. 49 ("JSF") ¶¶ 1, 3. Bockian joined the company full time in August 2012, at age 53, as a managing director and head of funding and short-term investments in its corporate treasury department. *Id.* ¶ 6; Pl. 56.1 ¶ 122. He was responsible for domestic funding operations, including oversight of market-facing transactions. JSF ¶ 7.

Although his position was based in BNY's New York office, and he was designated a New York employee, from the start of his employment, Bockian resided in California. Dkt. 58 ("Def. 56.1") ¶¶ 9, 11; Pl. 56.1 ¶ 130. Between August 2012 and spring 2022, he reported to Scott Friedenrich, BNY's treasurer. JSF ¶ 8. Friedenrich knew Bockian lived in California and

---

[1] The Court draws its account of the underlying facts from the parties' respective submissions on the motion for summary judgment, including: the parties' joint statement of undisputed facts, Dkt. 49 ("JSF"); BNY's Local Rule 56.1 statement, Dkt. 58 ("Def. 56.1"); Bockian's counter-statement, Dkt. 72 ("Pl. 56.1"); BNY's reply to the counter-statement, Dkt. 77 ("Def. Reply 56.1"); the declarations in support of BNY's motion, plus attached exhibits, of Rebecca Hegazy, Dkt. 52, Danielle Pell, Dkt. 53 ("Pell Decl."), Gabriella Gordon, Dkt. 54 ("Gordon Decl."), Sarah McAvoy, Dkt. 55, Lisa Blank, Dkt. 56 ("Blank Decl."), and Lisa Ferrante, Dkt. 57 ("Ferrante Decl."); the declarations in opposition to BNY's motion, plus attached exhibits, of Anne L. Clark, Dkt. 66 ("Clark Decl."), Bockian, Dkt. 68 ("Bockian Decl."), Annalisa Fratantoni, Dkt. 70 ("Fratantoni Decl."), and Frank Vasta, Dkt. 71 ("Vasta Decl."); and the reply declaration of Rebecca Hegazy in further support of BNY, Dkt. 81.

Citations to a party's Rule 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Loc. Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* R.56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

permitted him to work two to three weeks a month in New York and the remainder in California, either from BNY's Los Angeles office or from his home. Pl. 56.1 ¶¶ 132, 134. Bockian initially intended to relocate to New York full time, but ultimately decided against doing so "[d]ue to family issues." *Id.* ¶ 135. Friedenrich authorized Bockian to continue commuting between California and New York. *Id.* ¶ 136.

### 2. Bockian's Medical Condition

In or about March 2020, during the COVID-19 pandemic, Bockian began working remotely, as did most of BNY's workforce. JSF ¶¶ 11–12. In or about September 2021, Bockian contracted COVID. Pl. 56.1 ¶ 147. In early 2022, he was diagnosed with long COVID, which caused him extreme fatigue, joint and muscular pain, breathing issues, and headaches. *Id.* ¶ 148. His doctor advised him that rest was necessary for his recovery and that regular cross-country travel was inadvisable. *Id.* ¶ 150. Shortly after his diagnosis, Bockian told Friedenrich he had long COVID and might eventually require an accommodation. *Id.* ¶ 151. He "probably [took] some time off" in light of his condition and began to take, when necessary, breaks of approximately 15 minutes during the workday. Def. 56.1 ¶ 25.

### 3. McAvoy's Appointment and Her Return-to-Office Expectations

On December 17, 2021, BNY invited employees to return to the office "on a voluntary basis." JSF ¶ 13.

On March 7, 2022, Sarah McAvoy, then age 56, succeeded Friedenrich as treasurer and as Bockian's supervisor. Pl. 56.1 ¶ 152. Bockian told McAvoy he was working remotely from his home in California. *Id.* ¶ 157. McAvoy did not require Bockian to return to the office at that time; he continued working remotely. Def. 56.1 ¶ 29.

In March 2022, Bockian had a phone call with Gabriella Gordon, a member of BNY's human resources department, about the process for requesting an accommodation. Pl. 56.1

¶ 159. Bockian did not formally request an accommodation during the call and does not recall whether he told Gordon about his long COVID diagnosis. Def. 56.1 ¶ 31. In a follow-up email, Gordon told Bockian he could submit an accommodation request through the "My HR" system and gave him instructions for doing so. *Id.* ¶ 32. In an email on March 11, 2022, Gordon told Bockian that, if he had permanently relocated to California, he should update his residential address and consider submitting a work from home/based at home request ("BAH Request"). *Id.* ¶ 33. At the time, Gordon reported to Danielle Pell, BNY's global head of human resources. Pl. 56.1 ¶ 161.

Pell later reached out to McAvoy to determine whether Bockian needed approval to continue working from California. *Id.* ¶ 162. On March 11, 2022, McAvoy confirmed that Bockian was based in California, although listed internally as based in New York. Def. 56.1 ¶ 34. McAvoy told Pell that Emily Portney, BNY's chief financial officer and McAvoy's supervisor, had been "shocked" to learn Bockian was working from California. Pl. 56.1 ¶ 163. Pell responded that, if Bockian intended to remain in California, he would need to submit a BAH request. Def. 56.1 ¶ 34. At Pell's suggestion, McAvoy spoke to Friedenrich about Bockian's work location. Pl. 56.1 ¶ 164.

In the second quarter of 2022, BNY issued a statement expressing a preference for employees to return to the office two to three days a week. *Id.* ¶ 170. McAvoy forwarded that statement to her direct reports, stating, according to Bockian, that her "own preference was that people return to the office more quickly and more times per week than two to three." Clark Decl., Ex. 2 ("McAvoy Dep.") at 104. Bockian sensed that McAvoy was disappointed that her team had not fully returned to in-person work; he termed McAvoy's preference for employees to work from the office a "repetitive mantra." Clark Decl., Ex. 1 ("Bockian Dep.") at 102–04. He

testified that, at staff meetings, McAvoy made statements to that effect and to the effect that BNY was not moving quickly enough to bring employees back to the office. *Id.* at 106–07; *see also id.* at 195 ("I remember it as being a persistent message, so like not just one staff meeting . . . . [S]he expressed to people in the office who were coming back two to three days a week that she didn't understand why it wasn't more.").

On August 18, 2022, BNY's global head of human resources sent employees an email stating that they were "expected to be physically working on site in their designated offices a minimum of two to three days per week." JSF ¶ 14.

#### 4. The RIF and Bockian's Accommodation Requests

During summer 2022, BNY began a company-wide review in anticipation of a reduction in force ("RIF"). Def. 56.1 ¶ 40. McAvoy testified that she first became involved in the RIF selection process in July 2022 when she was asked to identify roles for elimination for the treasury department. *Id.* ¶ 45. On August 4, 2022, Roman Regelman, BNY's CEO of securities services and digital, announced: "We will perform a near term review and identify potential RIFs to action in September and, as needed, in November. . . . For the September RIF, identified roles need to be submitted by August 18. Please take this very seriously." Pell Decl., Ex. A at 4. McAvoy testified that, in August, she compiled a list of 10 to 15 employees, which included Bockian. Pl. 56.1 ¶¶ 195, 199. McAvoy did not recall, however, whether the final termination list was the one she had recommended in August. McAvoy Dep. 129–30.

In September 2022, Bockian spoke to McAvoy about a potential accommodation request. Def. 56.1 ¶ 57. He informed McAvoy of his long COVID diagnosis and anticipated need for a medical accommodation. Bockian Dep. 116–18. He further testified that he raised with her the possibility of being designated an employee of the Los Angeles office, enabling him to avoid regular cross-country travel. *Id.* at 119–20. Bockian testified that McAvoy appeared "aghast" at

the suggestion and asked, "How do you expect me to tell the CEO that our head of funding is working from Los Angeles[?]" *Id.* at 120. He testified that McAvoy refused to consider the proposal and characterized his desire to remain in California as a "lifestyle choice." *Id.* at 120. Bockian read that remark to reflect McAvoy's view that his request arose from a personal preference to remain in California, rather than a medical need to limit air travel. *Id.* at 125. McAvoy directed Bockian to submit an accommodation request through human resources. Def. 56.1 ¶ 58.

On September 30, 2022, Portney asked Pell whether Bockian was included on the RIF list for January or March. Pl. 56.1 ¶ 196. The next day, Pell responded, "Sure thing, We've discussed Bockian. It is on [McAvoy's] mind. Will revert." *Id.*; Clark Decl., Ex. 3 ("Pell Dep.") at 82. On October 31, 2022, Pell and Gordon circulated a list of employees officially slated for termination in the RIF, including Bockian. Def. 56.1 ¶ 47. Pell's email called the RIF the "K+ exercise," a reference to employees at or above BNY's K level. Pell Decl., Ex. B at 2; Def. 56.1 ¶ 46.

On November 5, 2022, Bockian submitted a formal accommodation request, seeking "[d]esignated work from home status," an "[a]llowance for occasional, short break intervals away from [] desk," a 45-hour workweek, and the elimination of travel requirements. Clark Decl., Ex. 25 ("Accommodation Request") at 2. These accommodations had been recommended by his physician, who stated that Bockian suffered from "fatigue, stamina deficiency, muscle aches, joint pain, shortness of breath, and eye pain," which impaired "his ability to work more than 40-45 hours per week" and "travel by plane." *Id.* at 3–4. His physician stated: "Without listed requested accommodations, patient[] faces major risk for further morbidity." *Id.* at 4. The physician's note did not identify long COVID as the cause of Bockian's symptoms. *Id.*

BNY never formally approved or denied Bockian's accommodation request. On November 11, 2022, McAvoy, Pell, and Steffali Welch, BNY's chief operating officer of finance, discussed the request. Pl. 56.1 ¶ 179. Notes from the meeting state that Bockian "was in [the] exercise already before." *Id.* That day, BNY told Bockian his request had been received and "is currently under review." Def. 56.1 ¶ 71; Clark Decl., Ex. 28 at 11. The same day, Portney requested information about employees who had not returned to the office and warned that those without an authorized reason to work remotely might not receive a discretionary bonus. Pl. 56.1 ¶ 172; Clark Decl., Ex. 24 at 2.

On December 1, 2022, McAvoy sent an email, which, she testified, concerned discretionary incentive compensation awards for employees. Clark Decl., Ex. 32 at 2; McAvoy Dep. 159–63; Pell Dep. 103–07. Referring to chief financial officer Dermot McDonough, she wrote: "Dermot feels strongly about long tenure/senior staff in K+." Clark Decl., Ex. 32 at 2. The email included a "list of individuals from my K+ that fall into those categories from highest priority at top," including Jeff Bockian, next to whose name appeared "senior, long tenure." *Id.* McAvoy testified that "long tenure" referred to employees who had been at the company for five years or longer, and that "senior" meant a "business, direct report or business head within Treasury." McAvoy Dep. 162–63. The email meant, she testified, that McDonough wanted "individuals who had been long tenured or had higher level positions to be treated with dignity and fairness in the compensation process." *Id.* at 162.

On December 13, 2022, BNY told Bockian his accommodation request remained under consideration, and that he "may continue to work remotely until a decision has been made." Pl. 56.1 ¶ 179; Def. 56.1 ¶¶ 71–72. In the meantime, Bockian was able to take breaks and did not travel. Def. 56.1 ¶¶ 66–70. Bockian was neither instructed to limit his workweek to 45 hours

nor explicitly required to work more than that. *Id.* ¶ 68. He continued to work more than 45 hours per week for the next two months. Pl. 56.1 ¶ 178. Upon Bockian's termination, BNY closed his accommodation request, without a resolution. Def. 56.1 ¶ 73.

**5. Bockian's Termination and the Redistribution of His Responsibilities**

In January 2023, Bockian, then age 64, was notified that his position was being eliminated as part of the RIF. JSF ¶ 15. His employment ended January 29, 2023. Def. 56.1 ¶ 113. In accordance with the Older Workers Benefit Protection Act ("OWBPA"), BNY informed him that seven employees had been selected for termination from within BNY's U.S. Corporate Treasury department, across two phases of the RIF. Gordon Decl., Ex. B at 3–7; Pl. 56.1 ¶ 207. Two—both age 64, one of whom was Bockian—were selected in the current phase. Pl. 56.1 ¶ 208. Five employees had been selected in an earlier phase; one was age 64 and the others were in their 50s. Gordon Decl., Ex. B at 3–7.

Bockian's responsibilities were assumed by other employees, including McAvoy, Gabriel Schneider, who had reported to Bockian, and Robin Savchuk, a peer of Bockian. Def. 56.1 ¶ 48; Pl. 56.1 ¶ 216. Schneider was 18 years younger than Bockian and Savchuk was seven years younger; neither had a known disability. Clark Decl., Ex. 7 at 2; Clark Decl., Ex. 8 at 2. Bockian's position was not filled by a new hire. Def. 56.1 ¶ 51. His duties were redistributed among existing employees or, in some instances, automated. *Id.*; Pl. 56.1 ¶ 51.

On February 20, 2023, after receiving an email from a business counterparty addressed to Bockian and Vasta, McAvoy instructed the party to correspond instead with two other employees. Clark Decl., Ex. 37 at 2. On August 30, 2023, when a BNY employee asked McAvoy who had replaced Bockian, she identified Savchuk. Clark Decl., Ex. 38 at 2.

One other employee, Frank Vasta, was terminated the same day as Bockian. Pl. 56.1 ¶ 209. Vasta was then age 65, Clark Decl., Ex. 35 at 2, and, after a serious case of COVID, had

been afforded a BAH arrangement. *Id.* ¶ 212. Vasta's responsibilities were assumed by others and/or automated. *Id.* ¶ 220.

### 6. Restricted Stock Units

In 2020, 2021, and 2022, BNY granted Bockian restricted stock units ("RSUs"). JSF ¶ 19. These were granted pursuant to (1) BNY's Long-Term Incentive Plan (the "Plan"), (2) applicable Award Notices, and (3) the Terms and Conditions of Restricted Stock Units (the "Terms and Conditions") (collectively, the "RSU Award Agreements"). *Id.* Each RSU entitled Bockian to receive one share of BNY common stock, par value $.01, upon satisfaction of the applicable vesting conditions. *Id.* ¶ 21. The RSUs vested over three years, subject generally to Bockian's continued employment through the close of business on each vesting date. *Id.* ¶¶ 21, 24. Subject to specified exceptions, RSUs that remained unvested upon termination of employment were forfeited. Def. 56.1 ¶ 104.

Bockian accepted awards of 6,733 RSUs in 2020, 7,273 RSUs in 2021, and 5,321 RSUs in 2022. JSF ¶¶ 20, 30, 41. As of his termination, 2,244 RSUs from the 2020 award, 4,848 RSUs from the 2021 award, and 5,321 RSUs from the 2022 award remained unvested. Def. 56.1 ¶ 113. Of these, 2,244 RSUs from the 2020 award were scheduled to vest on February 10, 2023. Pl. 56.1 ¶ 230. Another 2,424 RSUs from the 2021 award were scheduled to vest on February 8, 2023. *Id.* ¶ 235. And 1,774 RSUs from the 2022 award were scheduled to vest on February 15, 2023. *Id.* ¶ 240.

The RSU Award Agreements for all three years contained the same pertinent provisions. Before accepting the awards, Bockian received (and acknowledged receiving) the RSU Award Agreements. JSF ¶¶ 22–23, 43–44. He had an opportunity to review these and understood that, by accepting the awards, he was agreeing to their terms. Def. 56.1 ¶¶ 110–111.

Section 2.1(a) of the Terms and Conditions read:

> [I]f you remain continuously employed with your Employer through the close of business on the applicable Vesting Date reflected in the Award Notice, the number of RSUs corresponding to such Vesting Date will vest and the Corporation will issue you the underlying shares of Common Stock in accordance with Section 4 of these Terms and Conditions. Notwithstanding anything to the contrary contained in the Award Agreement and in accordance with Section 4.1, a vesting may be delayed if, on the Vesting Date, you are the subject of ongoing disciplinary or performance management investigations or proceedings concerning the circumstances under which forfeiture or clawback of this award could apply.

Ferrante Decl., Ex. A at 5–17 ("Terms and Conditions") at 5. Section 2.1(b) read:

> [I]f you cease to be continuously employed with your Employer prior to the date that your RSUs become fully vested, you shall cease vesting in your RSUs as of your Termination Date and any unvested RSUs, including any dividend equivalent rights, immediately shall terminate and be forfeited. . . . [H]owever, if the Risk Adjustment Process applies to your award . . . in situations where vesting would have otherwise occurred but for the fact that a determination has not yet been made as to whether a risk adjustment pursuant to Exhibit A is required, vesting shall occur in accordance with the terms of the Award Agreement provided that the Committee determines the effect, if any, of any risk adjustment.

*Id.* at 7. Section 5.4 read:

> If, directly or indirectly . . . (d) following termination of your employment with your Employer for any reason, with or without Cause, you violate any post-termination obligations or duties owed to the Corporation or its Affiliates under any agreement with the Corporation or its Affiliates . . . the Corporation may cancel all or any portion of the RSUs and/or require repayment of any shares of Common Stock (or the value thereof) or other amounts which were acquired pursuant to The RSUs (including without limitation any dividends paid on the shares of Common Stock and dividend equivalents). The Corporation shall have the sole discretion to determine what constitutes grounds for forfeiture and/or repayment under this Section 5.4, and in such event, the portion of the RSUs that shall be cancelled and the sums or amounts that shall be repaid.

*Id.* at 12–13; JSF ¶ 48. Section 5.6(e) read:

> No claim or entitlement to compensation or damages shall arise from forfeiture of the RSUs resulting from the termination of your employment or other service relationship (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any). In consideration of the grant of the RSUs, you expressly agree not to institute any such claim against the Corporation, any of its Affiliates or your Employer.

Terms and Conditions at 12; JSF ¶ 47. And Section 5.13 read:

> You shall indemnify the Corporation and hold it harmless from and against any and all damages or liabilities incurred by the Corporation (including liabilities for attorneys' fees and disbursements) arising out of any breach by you of these Terms and Conditions.

Terms and Conditions at 16; JSF ¶ 49.

After Bockian's termination, BNY distributed to him 6,442 RSUs that had been scheduled to vest in February 2023, including: 2,244 from the 2020 award, 2,424 from the 2021 award, and 1,774 from the 2022 award. Def. 56.1 ¶ 114. BNY maintains that these distributions were inadvertent. *Id.* Bockian sold the shares, as he had done with earlier awards, and received approximately $300,000 in proceeds. Pl. 56.1 ¶¶ 247–248; Def. 56.1 ¶ 116.

BNY asserts that it discovered the erroneous distributions after Bockian filed an EEOC charge on October 12, 2023. Def. 56.1 ¶¶ 115, 118. BNY did not seek repayment from Bockian before asserting its counterclaims in this action. Pl. 56.1 ¶¶ 250–251. Bockian has not repaid the proceeds. Def. 56.1 ¶ 117.

**7. Post-Termination Employment Search**

Approximately two weeks after his termination, Bockian began searching for new employment. Pl. 56.1 ¶ 256. His efforts included contacting individuals in his professional network, reviewing job postings on LinkedIn and the JJ Alerts website, sending LinkedIn messages to several people, and speaking with a recruiter on one or two occasions. Pl. 56.1 ¶¶ 257–260; Bockian Dep. 226–28. He contacted close friends about employment opportunities, Bockian Dep. 226–28, spoke with the chief strategist at Société Générale, *id.* at 225, and spoke with the CFO of Wells Fargo Bank, concerning a position he viewed as a "perfect" fit. Pl. 56.1 ¶ 262; Bockian Dep. 229. He attempted to pursue other positions, but, before applying, learned that the openings had been filled. Bockian Dep. 228. As of his deposition, he had not obtained

another job or sought unemployment benefits, but was pursuing a position with the California State Retirement System. *Id.* at 231.

### B. Procedural History

On October 12, 2023, Bockian filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that BNY had discriminated against him based on age and disability. JSF ¶ 52. The EEOC issued Bockian a notice of right to sue. *Id.* ¶ 54.

On November 8, 2024, Bockian brought this case. Dkt. 1. On January 13, 2025, BNY answered and brought two counterclaims. Dkt. 9. One sought recovery of approximately $300,000 in proceeds from the 6,442 RSUs it claimed it had erroneously distributed to Bockian after his termination. *Id.* at 25–27. The other alleged that Bockian had breached the RSU Award Agreements by seeking equity-related damages in this action and thereby forfeited his right to certain relief, including recovery of the value of RSUs he forfeited upon termination. *Id.* at 28–30. On February 3, 2025, Bockian filed an amended complaint, Dkt. 14 ("AC"), and an answer to the counterclaims, Dkt. 15.[2] On April 21, 2025, BNY answered and reasserted its counterclaims. Dkt. 21 ("Answer").

On April 24, 2026, BNY moved for summary judgment on Bockian's claims and its counterclaims, Dkt. 50, and filed a memorandum in support, Dkt. 51 ("BNY Mem."). On May 22, 2026, Bockian filed his opposition. Dkt. 64. On June 5, 2026, BNY filed a reply. Dkt. 79.

## II. Legal Standards Governing Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

[2] Bockian initially brought claims under the California Fair Employment and Housing Act, Cal. Gov't Code § 12900 *et seq.*, but later withdrew them. Dkt. 47 at 24–25.

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

"[A]n extra measure of caution is merited" in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001). Nevertheless, courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact." *Id.* (citation omitted); *see also Dickens v. Hudson*

*Sheraton Corp.*, 167 F. Supp. 3d 499, 510 (S.D.N.Y. 2016) ("[W]hen an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination . . . the Court may conclude that no material issue of fact exists.").

## III. Discussion

### A. Age Discrimination Claims

Bockian brings claims of age discrimination under the ADEA, the NYSHRL, and the NYCHRL. AC ¶¶ 54–57, 62–69. The Court first considers Bockian's ADEA claim.

#### 1. ADEA Claim

##### *a. Legal Standards Governing ADEA Discrimination Claims*

Discrimination claims under the ADEA are analyzed under the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105–07 (2d Cir. 2010). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) he belongs to a protected class; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Id.* at 107 (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000)). The plaintiff's burden at this initial stage is *de minimis*. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137 (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *See Gorzynski*, 596

F.3d at 107. The defendant's burden is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

If the defendant satisfies that burden, the presumption of discrimination arising from the *prima facie* case falls away, and the plaintiff must adduce evidence sufficient to permit a reasonable jury to find that discrimination was a but-for cause of the adverse employment action. *See id.* at 142–43; *Gorzynski*, 596 F.3d at 107. But-for causation does not require proof that discrimination was the *sole* cause of the adverse action. *See Natofsky v. City of New York*, 921 F.3d 337, 341 (2d Cir. 2019). The plaintiff may satisfy this burden by demonstrating that the defendant's proffered explanation was pretextual. *See Reeves*, 530 U.S. at 147–48; *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009); *Wolf v. Time Warner, Inc.*, 548 Fed. App'x 693, 694 (2d Cir. 2013) (summary order).

### *b. Bockian's* Prima Facie *Case*

The parties do not dispute that Bockian has established the first three elements of a *prima facie* ADEA case: He was a member of the protected class (individuals over age 40, under 29 U.S.C. § 631(a)), qualified for his position, and suffered an adverse employment action. BNY Mem. at 7–9; Opp. at 14. The dispute centers on the fourth element. Bockian cites three loci of evidentiary support that his age factored into his inclusion in the RIF: (1) his responsibilities were reassigned to younger employees after his termination; (2) BNY executives made remarks about younger talent; and (3) the RIF disproportionately affected older employees. Opp. at 14–18.

#### i. Reassignment of Bockian's Duties to Younger Employees

An employee's replacement by a younger worker may give rise to an inference of age discrimination sufficient to establish a *prima facie* case. *See Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 505 (S.D.N.Y. 2012), *aff'd*, 766 F.3d 163 (2d Cir. 2014). But the redistribution

of an employee's responsibilities among existing employees, even younger ones, after a RIF does not, without more, give rise to that inference. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168–69 (2d Cir. 2001); *Delaney*, 766 F.3d at 169–70.

Here, it is undisputed that Bockian's position was eliminated as part of a RIF and that his responsibilities were redistributed among existing employees, eliminated, or automated. Def. 56.1 ¶ 48; Pl. Counter 56.1 ¶¶ 48, 51; McAvoy Dep. 141. The parties disagree as to the extent to which particular employees assumed Bockian's responsibilities. Bockian maintains that two younger employees assumed most of them: Savchuk, BNY's international treasurer and a peer of Bockian, and Schneider, a managing director who had reported to Bockian. Pl. 56.1 ¶ 216. Each was over age 40 at the time.[3] The evidence supports that each assumed significant portions of Bockian's responsibilities. In January 2023, McAvoy announced that Savchuk would assume the role of global funding executive, overseeing the corporate treasury's market-facing activities, which included several responsibilities that Bockian had previously handled (wholesale funding for the holding company and NA Bank, Federal Home Loan Bank borrowing, and U.S. reserve management). Clark Decl., Ex. 39 at 2–3; McAvoy Dep. 181–82. Schneider also assumed certain of Bockian's responsibilities. Pl. 56.1 ¶ 219; McAvoy Dep. 217–18. In August 2023, when a BNY employee asked who had replaced Bockian on a project, McAvoy identified Savchuk. Clark Decl., Ex. 38 at 2.

But the record does not establish that Savchuk, Schneider, or any other current or new employee assumed Bockian's former position in its entirety. The January 2023 announcement described a broader reorganization of treasury responsibilities, under which Savchuk took on the global funding executive role and Schneider and Hammad Hussain were assigned more

[3] Savchuk and Schneider were around 57 and 46, respectively, in 2023. Clark Decl., Exs. 7–8.

responsibilities. Clark Decl., Ex. 39 at 2–3. Hussain took on international treasury activities, and Savchuk's new portfolio included functions beyond those Bockian had handled. *Id.*; McAvoy Dep. 181–82. McAvoy also took on some of Bockian's responsibilities, including conducting funding meetings and interacting with external counterparties. McAvoy Dep. 141, 191.[4]

The undisputed evidence thus reflects a redistribution of Bockian's responsibilities across several persons rather than a single successor. That distinction matters. The redistribution of a terminated employee's responsibilities among existing employees, including younger ones, has been held not to give rise to an inference of age discrimination. *See Roge*, 257 F.3d at 168–69; *Delaney*, 908 F. Supp. 2d at 505. This case is thus far afield from cases like *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561 (S.D.N.Y. 2010), in which an inference of age discrimination arose from the transfer of a plaintiff's responsibilities to a single employee 12 years younger. *Id.* at 573. Moreover, although Savchuk's and Schneider's ages (within the ADEA protected class) does not foreclose an inference of discrimination, *see O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996), they undermine that inference to the extent that it is based on those employees taking on Bockian's responsibilities. *Compare Hamburg v. N.Y.U. Sch. of Med.*, 62 N.Y.S.3d 26, 78 (N.Y. App. Div. 2017) (no inference of discrimination where physician's functions were reassigned to physician in her forties), *with Montana v. First Fed. Sav. & Loans Ass'n of Rochester*, 869 F.2d 100, 104–05 (2d Cir. 1999) (*prima facie* case established where, among other supportive factors, employee's responsibilities

---

[4] The record does not establish who took over Bockian's work heading funding and debt management. Clark Decl., Ex. 28 at 2–3.

were transferred to substantially younger employees), *and Burger v. N.Y. Inst. of Tech.*, 94 F.3d 830, 833–35 (2d Cir. 1996) (same).

The reallocation of Bockian's responsibilities thus does not support an inference of age discrimination. *See, e.g.*, *Lomonoco v. Saint Anne Inst.*, 768 Fed. App'x 43, 44 (2d Cir. 2019) (summary order) (no inference results from redistribution of responsibilities to comparably aged employees); *Parcinski v. Outlet Co.*, 673 F.2d 34, 36 (2d Cir. 1982) (same); *Frumkin v. IBM Corp.*, 801 F. Supp. 1029, 1039 (S.D.N.Y. 1992) (same).

ii. Remarks of Executives

Bockian also cites (1) statements about the age of BNY's workforce, attributed by an online article to BNY CEO–elect Robin Vince and co–head of wealth solutions Ben Harrison; and (2) a comment by CFO McDonough on the same subject, relayed to Bockian by a colleague.

The article reported Vince's "wide-ranging keynote" address at an annual BNY conference, at which he emphasized the importance of innovation for BNY as one of the oldest firms listed on the New York Stock Exchange. Clark Decl., Ex. 29 ("Vince Article") at 2. Vince's proffered examples of BNY's innovation were the development of a new online platform, investments in new technology for clients, and the recruitment of younger talent, whom he said could "sharpen[] us up" and "add[] new skills and talents to an organization." *Id.* at 2–3. As a "joke[]," he likened "newcomers to the field" to kids, who "tend to always ask 'why,'" which drew laughs from the audience. *Id.* at 3. Harrison similarly noted, in discussing a new program designed to connect university students with financial-services professionals for mentorship and career development, that the "next generation of talent has the power to reshape our industry." *Id.*

Even assuming the article's secondhand account of Vince's remarks were admissible, it does not support the inference that Bockian's age played a role in his termination. Courts

assessing the probative value of allegedly discriminatory remarks consider four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). Here, although Vince and Harrison were senior BNY executives, there is no evidence that either participated in the decision to include Bockian in the RIF. McAvoy Dep. 124, 128. Their remarks predated the RIF by six months and were made in an unrelated general discussion of innovation, recruitment, and professional development. Vince Article at 2–3. And an employer's expressed interest in attracting younger talent does not, without more, establish a preference to terminate older employees. *Carter v. Verizon*, No. 13 Civ. 7579, 2015 WL 247344, at *6 (S.D.N.Y. Jan. 20, 2015) (employer's stated desire for "new blood" did not give rise to reasonable inference of age discrimination); *Dixon v. Int'l Fed'n of Accountants*, 416 Fed. App'x 107, 109–10 (2d Cir. 2011) (summary order) (affirming summary judgment where isolated derogatory remark was made by an employee without authority over plaintiff's termination); *Delaney*, 908 F. Supp. at 505–08 (comments about another employee's age insufficient to establish inference of discrimination where disconnected from employment decision at issue); *Moore v. Verizon*, No. 13 Civ. 6467, 2016 WL 825001, at *8–9 (S.D.N.Y. Feb. 5, 2016) (age-related remarks insufficient to support discriminatory inference where context was unrelated to plaintiff's suspension and termination); *Cruz v. Bernstein Litowitz Berger & Grossmann LLP*, No. 20 Civ. 8596, 2023 WL 2691456, at *16 (S.D.N.Y. Mar. 29, 2023) (isolated remarks about age insufficient, even under NYCHRL's more lenient standards, to sustain inference of discriminatory intent); *Rodriguez v. City of New*

*York*, No. 09 Civ. 1378, 2011 WL 3610751, at *12 (E.D.N.Y. Aug. 16, 2011) (allegedly ageist comments too temporally remote from termination to support discriminatory inference under NYCHRL), *aff'd*, 484 Fed. App'x 637 (2d Cir. 2012) (summary order).

Bockian's testimony underscores the irrelevance of these remarks. Asked if McAvoy, who selected him for the RIF, ever said anything suggesting bias against older workers, Bockian said no. Bockian Dep. 133. Asked if he had ever heard Vince or Portney say anything that suggested bias against older workers, Bockian did not recall any. *Id.* And although he testified that there was "a lot of talk going around" to the effect that the executive team believed BNY had too many older workers, he could not identify any specific statement. *Id.* at 133–34. Bockian's generalized impressions do not support an inference of discriminatory intent. *Wagh v. Wilkie*, No. 18 Civ. 7726, 2020 WL 5732035, at *5 (S.D.N.Y. Sep. 24, 2020) ("[A]llegations of discrimination that 'are conclusory and wholly without evidentiary support' will not suffice." (quoting *Woods v. Ruffino*, 8 Fed. App'x 41, 42 (2d Cir. 2001) (summary order))).

Bockian's account of a comment by CFO McDonough also does not fortify his claim. Bockian testified that a colleague, Karl Schultz, stated that McDonough was pleased about reducing the average age of BNY's workforce. Bockian Dep. 134. But Bockian did not hear McDonough's statement or adduce testimony from Schultz about it. He did not know what specifically was said or when, where, or in what context. *Id.* 134–35. His secondhand account is thus inadmissible hearsay that is out of bounds on summary judgment. *See* Fed. R. Evid. 801; *Santos v. Murdock*, 243 F.3d 681, 683–84 (2d Cir. 2001) (hearsay evidence cannot establish a genuine issue of material fact). In any event, the lack of connection between McDonough's statement and the RIF or Bockian would give it limited, if any, probative value. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000) ("[W]hile second-hand

comments may be relevant, a district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions.").[5]

The remarks on which Bockian relies thus would not permit a reasonable jury to infer that age played a role in BNY's decision to include him in the RIF. *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (district court can "properly refuse[] to rely on" "bald assertions and legal conclusions"); *Garrison v. Am. Sugar Refining, Inc.*, 789 F. Supp. 3d 291, 313 (S.D.N.Y. 2025) (inadmissible evidence insufficient to create genuine issue of fact in discrimination case); *Szarzynski v. Roche Lab'ys, Inc.*, No. 07 Civ. 6008, 2010 WL 811445, at *6 (S.D.N.Y. Mar. 1, 2010) (plaintiff failed to establish *prima facie* case of age discrimination where allegedly discriminatory comment substantially consisted of hearsay).

iii. Statistical Evidence

Bockian, finally, cites statistics as to the impact of the RIF. Statistical evidence that older employees were disproportionately selected for termination may "provide circumstantial evidence of an inference of discrimination in support of a *prima facie* case, as a matter of law." *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395–96 (S.D.N.Y. 2012); *Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 879–80 (2d Cir. 1997). The probative value of such evidence depends, however, on the relevant comparison group. *See Smith v. Xerox Corp.*, 196 F.3d 358, 368–70 (2d Cir. 1999). Here, Bockian's statistical showing concerning the age distribution of the terminated employees, viewed from four vantage points, is sufficient to make the *de minimis* showing required for a *prima facie* case.

First, according to the OWBPA disclosures accompanying Bockian's proposed separation agreement, of the approximately 203 employees in Corporate Treasury, 93, or 45.8%, were at

[5] The same caveat applies to Bockian's secondhand account of a statement by Schneider about BNY trying to reduce the number of older workers. Bockian Dep. 138.

least age 40. *See* Gordon Decl., Ex. B at 2–6; 29 U.S.C. § 631(a). But 100%—all—of the seven employees selected for termination, including those selected in a prior phase, were at least age 50, and three of those, or 42.9%, were at least age 60. Gordon Decl., Ex. B at 3.

Second, based on the same disclosures, the K+ workforce that BNY identified as the target of the RIF contained 133 employees, of whom 75 (or 56.4%) were age 40 or older. Gordon Decl. ¶¶ 5–7; *id.* Ex. B; Fratantoni Decl. ¶ 2; *id.* Ex. 1 at 3; Pl. 56.1 ¶ 215. However, 100% of the employees selected for termination were over age 40. *Id.* Likewise, 30.1% of the K+ workforce (40 employees) were over age 50, but 100% of the employees selected for termination were over age 50. *Id.* Finally, although employees aged 60 or older comprised only 8.3% (11 employees) of the K+ workforce, 40% of those terminated were over age 60. Gordon Decl., Ex. B at 3.[6]

Third, a separate list produced by BNY identifies 10 employees within McAvoy's treasury organization terminated between January 2023 and August 2024. Clark Decl., Ex. 36 at 2–3. Eight, or 80%, were at least age 40, and five, or 50%, were at least age 60. *Id.*

Fourth, Bockian attests—and the record adduced on summary judgment does not refute—that the only other treasury employee terminated contemporaneously with him was Vasta, who was approximately age 65. Pl. 56.1 ¶¶ 208, 211.

Although the sample sizes are very modest, under the case law, the burden to establish a *prima facie* case is light, too. *See Fisher v. Vassar Coll.*, 70 F.3d 1420, 1450 (2d Cir. 1999) ("If direct evidence is not available, 'a plaintiff may through statistical evidence establish a pattern or practice of discharging or failing to promote older employees, from which an inference of age

[6] Bockian maintains that employees aged 60 or older accounted for 60% of those selected. Pl. 56.1 ¶ 215. The underlying disclosure, however, identifies only two employees aged 60 or older among the five selected K+ employees, yielding a figure of 40%. Gordon Decl., Ex. B at 3.

discrimination may be drawn.'" (quoting *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir. 1984))). And the data Bockian has assembled is sufficient to give rise to an inference of age discrimination sufficient to support a *prima facie* case. It demonstrates, from multiple vantage points, that older employees were disproportionately selected for the RIF. *See, e.g.*, *Purdy v. Town of Greenburgh*, 166 F. Supp. 2d 850, 865–66 (S.D.N.Y. 2001) (plaintiff submitted "statistical evidence sufficient to create a triable factual issue as to whether an inference of [age] discrimination may be drawn" where he showed that many younger candidates with lower scores on employment exam were appointed to position from which he was rejected); *Hogan v. Metromail*, 167 F. Supp. 2d 593, 596–97 (S.D.N.Y. 2001) (inference of age discrimination sustained where employees age 40 and older constituted 63% of the workforce but 93% of employees negatively affected by challenged practices); *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 112–13 (2d Cir. 1992) (same where two of three older accounting employees, but none of approximately 20 younger accounting employees, were terminated); *Vaughn v. Mobil Oil Corp.*, 708 F. Supp. 595, 600–02 (S.D.N.Y. 1989) (*prima facie* case established on basis of disproportionate termination of older employees during a reorganization); *Mete v. N.Y. State Off. of Mental Retardation & Developmental Disabilities*, 984 F. Supp. 125, 137–38 (N.D.N.Y. 1997) (plaintiffs met *de minimis prima facie* burden where employees over 40 "were approximately three times as likely to be adversely affected by the RIF as those under the age of 40"). In sum, by adducing statistical evidence sufficient to maintain a minimal inference of discrimination, Bockian has satisfied his burden to establish a *prima facie* case of age discrimination under the ADEA.

#### c. *BNY's Legitimate, Non-Discriminatory Reason*

Because Bockian established a *prima facie* case for discrimination, the burden shifts to BNY to articulate a legitimate, nondiscriminatory and nonretaliatory reason for his termination.

BNY has met that burden. A RIF undertaken for legitimate business reasons is a recognized nondiscriminatory basis for termination. *See Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir. 1994) (recognizing business-justified RIF as legitimate explanation for terminating employees); *Carlton*, 202 F.3d at 136 (employer's evidence of a RIF sufficient to satisfy its burden of production); *Sgarlata v. Viacom, Inc.*, No. 02 Civ. 7234, 2005 WL 659198, at *7 (S.D.N.Y. Mar. 22, 2005) (RIFs generally suffice to rebut a plaintiff's *prima facie* showing).

Here, it is undisputed that Bockian was terminated as part of a companywide RIF designed to reduce expenses and improve organizational efficiency. And BNY has offered evidence that, among the positions eligible for elimination under the RIF, Bockian's was selected because his responsibilities could be eliminated, automated, or absorbed by other, lower-compensated employees, saving costs and promoting efficiency. Def. 56.1 ¶ 48. McAvoy testified that the K+ RIF was intended to reduce expenses by eliminating positions at specified senior job levels, including K, L, M, and S. McAvoy Dep. 209. Pell similarly testified that the RIF's goal was to "[r]educe head count and [secure] savings." Pell Dep. 70. As to Bockian specifically, Pell testified that McAvoy selected employees whose positions could be eliminated and that Bockian's responsibilities could be "absorbed by someone else." *Id.* at 73–74. Consistent with that, Bockian's responsibilities were absorbed, eliminated, or automated, and BNY did not hire a successor. Def. 56.1 ¶ 48.

Contemporaneous documents are in accord. On August 4, 2022, Roman Regelman informed the leadership team that BNY intended to conduct RIFs in September and, as necessary, November, and directed managers to identify positions for elimination. Pell Decl., Ex. A at 4. On October 31, 2022, Pell transmitted a headcount file identifying employees under consideration for the K+ RIF. Clark Decl., Ex. 31 at 2–3. These included Bockian. *Id.* at 3.

And on July 24, 2023, Samuel Martin wrote to Alex Birger that he was adding a position to the K+ list and requested confirmation so that savings associated with other positions could be estimated. Clark Decl., Ex. 28 at 9. These records corroborate that the RIF, and the selection of Bockian, was part of an ongoing effort to reduce personnel expenses.

At this stage, BNY need only produce evidence that it terminated Bockian for a lawful reason; it need not "persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). BNY has done so.

*d. Pretext and But-For Causation*

Because BNY has articulated a legitimate nondiscriminatory reason for the termination, the burden returns to Bockian to demonstrate that it arose from intentional discrimination. He may do this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. At this stage, Bockian "may no longer simply rely on having made out a *prima facie* case." *Gorzynski*, 596 F.3d at 107. He must adduce evidence on which a finder of fact could find that BNY's "articulated purpose" was not "the actual purpose for the" termination. *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170–71 (2d Cir. 1993). In assessing whether Bockian has done so, the Court considers the evidence as a whole, including that on which a *prima facie* case was found. *See Gorzynski*, 596 F.3d at 107. Bockian must adduce evidence sufficient to permit a reasonable jury to find that age was a but-for cause of his termination. *Id.* at 106.

Bockian does not refute—or even challenge—that the K+ RIF was undertaken to reduce personnel expenses. Pl. 56.1 ¶¶ 48, 53. He asserts, though, that the decision to include him was not solely because his responsibilities could be redistributed, eliminated, or automated, as BNY's

evidence supports. He contends that McAvoy, in implementing the RIF, chose employees for termination, at least in part, on the basis of age. AC ¶ 55.

Bockian is correct that the fact of a RIF does not insulate from ADEA liability an employer who selects employees for termination based on age. *See Carlton*, 202 F.3d at 136. He is also correct that the design of BNY's RIF gave McAvoy discretion to select employees. McAvoy testified that she was tasked with identifying some $5 million in compensation savings, by eliminating jobs in senior job categories K, L, M, and S. McAvoy Dep. 116–18. And the record does not reflect, in contrast to other cases, her discretion was constrained by a prescribed scoring system, performance criteria, or other objective formula dictating which employees to select. *See, e.g., Martinez v. N.Y.C. Transit Auth.*, 672 Fed. App'x 68, 70–72 (2d Cir. 2016) (summary order); *Delaney*, 766 F.3d at 168–69. Rather, as McAvoy acknowledged, she and other managers exercised judgment in identifying positions to be eliminated. *See* McAvoy Dep. 123–24, 128; Pell Dep. 73–74.

But the fact that a RIF gave managers discretion over who to include does not establish that the selections were pretextual—*i.e.*, that age was a but-for cause of the plaintiff's selection. *See Delaney*, 908 F. Supp. 2d at 510. Here, Bockian's only probative evidence is the statistics reviewed above—to the effect that an outsized number of employees terminated were over age 40. But while generalized statistical evidence such as that here may establish a *prima facie* case, the case law reflects that more is required at the third *McDonnell-Douglas* step: evidence that the employer's nondiscriminatory explanation for his termination was pretextual. In *Zito*, *supra*, for example, the district court held that statistical evidence concerning selections under a RIF, even if sufficient to establish a *prima facie* case, was insufficient to impugn the employer's legitimate business rationale as a pretext for age discrimination. 869 F. Supp. 2d at 395–96. Likewise, in

*Robinson v. Metro-North Commuter Railroad Co.*, the district court held generalized statistical evidence inadequate to rebut an employer's particularized explanation. No. 94 Civ. 7374, 1998 WL 17742, at *9 (S.D.N.Y. Jan. 16, 1998). The Second Circuit's decisions, too, drive home that, for statistical evidence to satisfy the plaintiff's burden at the third step, it must reasonably, not speculatively, support a claim of pretext. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 46 (2d Cir. 2000) (affirming grant of summary judgment for employer on ADEA claim based on statistical evidence); *Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355–56 (2d Cir. 1980) (same; statistics alone did not establish discrimination where plaintiff otherwise failed to make out her claim).

For several reasons, the statistical evidence marshalled by Bockian is too threadbare to enable a non-speculative finding of pretext. First, the sample sizes are small. *Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 121 (2d Cir. 1997) ("The smaller the sample, the greater the likelihood that an observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it."). Across the four vantage points, the statistical comparisons Bockian makes arise from the selection of eight employees over age 40. Had just three or four fewer older employees been selected, the percentage of terminated employees over age 40 would have approximated their proportion in the relevant workforce. Given the small samples, the statistical disparities are particularly susceptible to explanations other than age discrimination. *See, e.g.*, *Sattar v. Johnson*, 129 F. Supp. 3d 123, 139–40 (S.D.N.Y. 2015) (six employees too small a sample to support an inference of discrimination); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 115–16 (S.D.N.Y. 2009) (same as to nine employees).

Second, as BNY notes, the K+ RIF focused on eliminating highly compensated—and thus generally senior—positions. The record reflects that BNY selected positions for elimination with an eye toward reducing compensation expenses. For example, on July 24, 2023, Martin informed Birger that he was "adding one more FTE," presumably meaning a full-time equivalent position, "to the K+ list," and asked Birger to "estimate savings for all other (non-K+ roles)." Clark Decl., Ex. 28 at 9. Consistent with that cost-saving objective, BNY had reason to focus on senior employees, whose compensation would generally be higher. Indeed, as noted above, in reviewing compensation, BNY considered "who had been long tenured" and rewarded "long tenure/senior staff in K+." McAvoy Dep. 162–63; Clark Decl., Ex. 32 at 2. Because tenure and seniority tend to correlate with age, a RIF targeting highly compensated senior positions would predictably affect older employees disproportionately. Bockian's statistics would not enable a reasonable jury to find a selection driven by age as opposed to the permissible goal of reducing compensation expenses. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 608–13 (1993) (employer who discriminates based on factors correlated with age, such as "years of service," does not discriminate based on age); *Ludovicy v. Dunkirk Radiator Corp.*, 922 F.2d 109, 111–12 (2d Cir. 1990) (plaintiff's evidence of age discrimination insufficient where based on seniority of affected group; *Smith*, 196 F.3d at 370–71 (proportion of older employees terminated does not permit distinction between age-based versus seniority- and compensation-based selections); *Raymond v. Spirit AeroSystems Holdings, Inc.*, 125 F.4th 1016, 1023 (10th Cir. 2025) ("[A]n employer can use factors often associated with age as long as the employer doesn't act on the basis of age."); *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996) (under ADEA, "[s]tatistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext"); *Allen v. Diebold, Inc.*, 33 F.3d 674, 676 (6th Cir. 1994)

("[T]he ADEA prohibits only actions actually motivated by age and does not constrain an employer who acts on the basis of other factors—pension status, seniority, wage rate —that are empirically correlated with age.").

Third, the record does not establish that McAvoy independently made all the termination selections. She testified that managers and directors responsible for different groups made business assessments and recommendations that informed her decisions about whom to include in the RIF. McAvoy Dep. 122–23. Although McAvoy herself selected Bockian, McAvoy Dep. 124–28, the selection of others involved other decisionmakers and position-specific assessments. Bockian's statistics thus aggregate employees whose selections arose from a non-uniform process. The diversity of positions eliminated, the involvement of different managers, and the absence of evidence that the other employees were similarly situated to Bockian further weakens the probative value of Bockian's statistical contrasts. *See Smith*, 196 F.3d at 370–71 ("Because intent is the critical issue, only a comparison between persons evaluated by the same decision-maker is probative of discrimination."); *O'Sullivan v. N.Y. Times*, 37 F. Supp. 2d 307, 316–17 (S.D.N.Y. 1999) (probative value of statistics depends on circumstances of termination); *Zito*, 869 F. Supp. 2d at 395 (statistical analysis flawed where it included employees selected for termination by a different decisionmaker).

Notably, too, Bockian has not adduced evidence of any surrounding circumstance fortifying an inference of age-based selections. There is no evidence of ageist statements by McAvoy or any person working with her implementing the RIF. There are no records sorting persons eligible for termination by age. As to Bockian specifically, there are no documents supporting, even implicitly, his thesis that age played a role in his selection. *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 201–02 (2d Cir. 1999) (affirming summary judgment grant to

employer where plaintiff "put forth no proof of any age-related remarks or actions towards him . . . and admitted that his age was never explicitly raised as a factor in his termination"). And, as noted, BNY did not hire a younger employee to succeed Bockian; his responsibilities were distributed among existing employees. This case thus diverges from those sustaining ADEA claims supported by such proof. *See, e.g.*, *Carlton*, 202 F.3d at 135–37 (employer hired substantially younger replacement and its stated performance rationale was questionable); *Gorzynski*, 596 F.3d at 108–09 (age-related remarks, differential treatment of younger employees, and other evidence undermined employer's stated justification); *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115–16 (2d Cir. 2007) (same, based on repeated age-related remarks and replacement by a substantially younger employee).

Bockian's evidence, which reduces to statistical correlations that carry limited probative value, thus supplies an insufficient basis on which a jury could find pretextual BNY's evidence as to the basis for eliminating his position. *See Zito*, 869 F. Supp. 2d at 395–96 (entering summary judgment where statistical evidence insufficient to show pretext); *Robinson*, 1998 WL 17742, at *9 (same). The Court thus enters summary judgment for BNY on the ADEA claim.

### 2. NYSHRL and NYCHRL Claims

Claims under the NYSHRL and NYCHRL are subject to more liberal standards than those brought under the ADEA. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109–10 (2d Cir. 2013) (NYCHRL); *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122–23 (2d Cir. 2024) (NYSHRL). The Court here treats the NYCHRL standard as applicable to both.[7]

---

[7] Historically, the NYSHRL's standards were keyed to the ADEA's and ADA's. *See, e.g.*, *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001); *Graves v. Finch Pruyun & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006). The NYSHRL was amended, however, in 2019, "to align with the NYCHRL's more liberal pleading standard." N.Y. Exec. Law § 300; *Qorroli v.*

The central inquiry under the NYCHRL is whether the plaintiff was treated "less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8 (unclear whether, and to what extent, the *McDonnell-Douglas* framework applies to NYCHRL claims). The employer may offer evidence of legitimate, nondiscriminatory reasons for its actions, but doing so will not defeat a discrimination claim where the evidence also establishes that a protected characteristic of the employee was a "motivating factor" for that action. *Id.* at 110–11, 116; *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40 n.27 (N.Y. App. Div. 2009). Summary judgment against a plaintiff is appropriate only where the record would not permit a reasonable jury to find that discrimination played a role in the challenged employment action. *Mihalik*, 715 F.3d at 110; *Garrigan v. Ruby Tuesday, Inc.*, No. 14 Civ. 155, 2014 WL 2134613, at *3 (S.D.N.Y. May 22, 2014). To survive summary judgment, a plaintiff must adduce direct or circumstantial evidence from which a reasonable jury could so find. *See Hamburg*, 62 N.Y.S.3d at 81; *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 37 (N.Y. App. Div. 2012).

---

*Metro. Dental Assocs.*, 124 F.4th 115, 122–23 (2d Cir. 2024). The case law has not definitively resolved whether the 2019 amendment made the NYSHRL's standard identical to that of the NYCHRL—or merely closer to it. *See Shaughnessy v. Scotiabank*, No. 22 Civ. 10870, 2024 WL 1350083, at *10 (S.D.N.Y. Mar. 29, 2024) ("Though the post-amendment standard under the NYSHRL comes closer to the standard of the NYCHRL, it remains unclear whether the two standards were intended to be co-extensive or whether a plaintiff's burden under the NYSHRL resides somewhere between his burdens under the ADEA and the NYCHRL."). *Compare Arazi v. Cohen Bros. Realty Corp.*, No. 20 Civ. 8837, 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) ("After that amendment, the standard for NYSHRL aligns with the NYCHRL standard for claims that accrued on or after October 11, 2019."), *with Wellner v. Montefiore Med. Ctr.*, No. 17 Civ. 3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019) (amendment brings NYSHRL "closer to" NYCHRL standard). Although the precise extent to which the amended NYSHRL and NYCHRL standards are coextensive remains unsettled, courts in this District have generally applied the more liberal NYCHRL standard to post-amendment NYSHRL discrimination claims. *See, e.g.*, *Wright v. City of New York*, No. 23 Civ. 3149, 2024 WL 3952722, at *6 (S.D.N.Y. Aug. 27, 2024) (analyzing disability discrimination claim brought under NYSHRL under the liberal pleading standards of the NYCHRL). For the purpose of resolving this motion, the Court analyzes Bockian's NYSHRL claims under the more liberal standard applicable to his NYCHRL claims.

Bockian's evidence falls short of that standard. For the reasons above, that evidence reduces to high-level statistical correlations between age and inclusion in the RIF. Bockian has not adduced other evidence supporting that his age played a role in the decision to include him in the RIF. And, for the reasons noted, that statistical evidence would not permit a reasonable finder of fact to conclude, other than by speculation, that Bockian's age motivated his inclusion. *See, e.g.*, *Hudson v. Merrill Lynch & Co.*, 31 N.Y.S.3d 3, 8–9 (N.Y. App. Div. 2016) (statistical evidence on which plaintiff relied unavailing under NYCHRL, "because the sample sizes are 'too small to support an inference of discrimination'" and "in the absence of other evidence of [] discrimination, the statistics alone are insufficient to defeat summary judgment") (citation omitted); *Cruz*, 2023 WL 2691456, at *16 ("Plaintiff's flawed statistical evidence also does not suffice to raise an inference of discriminatory motive under the NYCHRL."); *Cardwell v. Davis Polk & Wardwell LLP*, No. 19 Civ. 10256, 2023 WL 2049800, at *25 (S.D.N.Y. Feb. 16, 2023) (statistics insufficient to establish discrimination under NYCHRL); *Twomey v. Quad/Graphics, Inc.*, No. 13 Civ. 1109, 2015 WL 5698002, at *9 (S.D.N.Y. 2015) (dismissing NYCHRL age-discrimination claim as based on insufficient statistical evidence); *Hu v. UGL Servs. Unicco Ops. Co.*, No. 13 Civ. 4251, 2014 WL 5042150, at *8 (S.D.N.Y. Oct. 9, 2014) (statistical evidence insufficient to support NYCHRL claim).

Accordingly, BNY is entitled to summary judgment on Bockian's ADEA, NYSHRL, and NYCHRL age-discrimination claims.

### B. Disability-Discrimination Claims

Bockian brings a series of claims implicating his long-COVID condition. He claims a failure to reasonably accommodate his disability; termination on the basis of his disability; and retaliation for requesting accommodations. These claims are brought under the ADA, NYSHRL,

and NYCHRL. The Court considers first the ADA claims, which present the most demanding liability standards.

### 1. Failure to Accommodate

Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008); *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015). To establish a *prima facie* failure-to-accommodate claim, a plaintiff must show that:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)).

Here, it is undisputed that Bockian's long COVID was a qualifying disability, that BNY had notice of that disability after his formal accommodation request, and that Bockian could perform the essential functions of his position with reasonable accommodations. BNY Mem. at 16–17. The dispute centers on the fourth element: whether BNY refused to provide Bockian a reasonable accommodation. In moving for summary judgment, BNY argues that the undisputed evidence is that it provided Bockian with the reasonable accommodations he requested. *Id.*; Reply at 12–13.

The reasonableness of an employer's accommodation is fact-specific. *Wernick v. Fed. Rsrv. Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996). An employer is entitled to summary judgment where the undisputed record establishes that it provided or offered an effective reasonable accommodation. *See Noll*, 787 F.3d at 94–95. An employer need not provide the

employee's preferred accommodation, or a perfect one, so long as the accommodation provided is reasonable. *Id.* at 95. As to the employee's burden, the employee need not show an express rejection to establish a denial. An employer's inaction or disregard of an employee's request can constitute an effective denial. See *Valentine v. Brain & Spine Surgeons of N.Y., P.C.*, No. 17 Civ. 2275, 2018 WL 1871175, at *7 (S.D.N.Y. Apr. 16, 2018); *Pahuja v. Am. Univ. of Antigua*, No. 11 Civ. 4607, 2012 WL 6592116, at *11 (S.D.N.Y. 2012). In assessing claims of constructive denial, courts have considered whether a delay reflected discriminatory intent, as opposed to mere administrative inefficiency. *See Marciano v. NBCUniversal Media, LLC*, No. 23 Civ. 8127, 2024 WL 4063743, at *5 (S.D.N.Y. Sep. 5, 2024); *Manessis v. N.Y.C. Dep't of Transp.*, No. 02 Civ. 359, 2003 WL 289969, at *17 (S.D.N.Y. Feb. 10, 2003); *see also Logan v. Matveevskii*, 57 F. Supp. 3d 234, 257 (S.D.N.Y. 2014). Under the ADA, an employer's failure to engage in an interactive process can supply evidence that it failed to accommodate an employee's disability. *See Tafolla v. Heilig*, 80 F.4th 111, 122–24 (2d Cir. 2023).[8]

The events surrounding Bockian's accommodation request are largely undisputed. On November 5, 2022, Bockian formally requested permission to continue working remotely, take occasional short breaks, limit his working hours to 45 per week, and eliminate employment-related travel. Blank Decl., Ex. G at 5. On November 11, Wick informed McAvoy of the request. Clark Decl., Ex. 28 at 11. Notes from a leadership-team discussion that day reflected that Pell and Welch had discussed Bockian's request and that Bockian "was in [the] exercise already," referring to the K+ RIF process. *Id.* The notes indicate consideration of granting an

---

[8] Similarly, under the NYCHRL, addressed *supra*, an employer's failure to engage in a constructive dialogue may support an inference of disability discrimination. *See Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 & n.2 (N.Y. 2014); *Wellner*,2019 WL 4081898, at *11.

accommodation for a limited period, possibly 90 days. *Id.* at 4. On November 11, BNY told Bockian that his request had been received and "is currently under review." Def. 56.1 ¶ 71. On November 28, after Wick followed up, Pell responded that human resources was handling the request. *Id.* at 10. Pell testified that, after Bockian's request, she discussed with McAvoy the fact that Bockian was already on the list of employees selected for reduction, to ensure that "everybody was aware" of the situation. Pell Dep. 89–90. On December 13, human resources told Bockian his accommodation request was "still under consideration," but assured him he could continue working remotely until a decision was made. Clark Decl., Ex. 11 at 3. On January 9, 2023, Bockian again sought an update. *Id.* at 4. By then, BNY had determined that Bockian would be terminated, although that determination remained confidential. McAvoy Dep. 170. On January 24, human resources told Bockian that it was closing his accommodation request in light of this termination. Clark Decl., Ex. 11 at 4. BNY thus never made a final determination on the merits of Bockian's request.

In evaluating Bockian's failure-to-accommodate claim, it is necessary to address the requested accommodations distinctly. Although BNY did not formally approve any of his requests, during the two months between the request and the termination, Bockian continued working remotely, did not travel for work, and took breaks when necessary. Bockian Dep. 75–76, 152–54, 160, 163–64. Bockian thus received—and largely acknowledges receiving—the accommodations he sought. Opp. at 9. Accordingly, notwithstanding the lack of formal approval, a reasonable jury could not find that BNY failed to accommodate Bockian to the extent he sought to work remotely, to avoid travel to work, and to take breaks during the workday. *See, e.g.*, *Seabrook v. N.Y.C. Health & Hosps. Corp.*, No. 13 Civ. 4164, 2015 WL 273652, at *6 (S.D.N.Y. Jan. 20, 2015) ("[I]n light of the record of [the employer's] acquiescence to

[plaintiff's] requests when made, we cannot say that [the employer] impeded the process of reasonable accommodation."); *Elmessaoudi v. Mark 2 Rest., LLC*, No. 14 Civ. 4560, 2016 WL 4992582, at *7 (S.D.N.Y. Sep. 15, 2016) (no failure to accommodate where employee was able to work requested hours and did not contest accommodation as inadequate). The ADA requires an effective accommodation, not formal approval, *see Noll*, 787 F.3d at 94–95, and Bockian received such as to these requests.

Bockian's request for a shorter workweek presents a different question. Bockian asked that his weekly hours be limited to 45. And his physician warned HR that, if not accommodated, Bockian "faces major risk for further morbidity." Accommodation Request at 4. BNY did not ever approve that limit on hours. Blank Decl., Ex. G at 5; Clark Decl., Ex. 11 at 2–5. And, Bockian testified, he continued working more than 45 hours per week through his termination. Bockian Dep. 154–58; Bockian Decl. ¶¶ 30–31, 68. He testified that although McAvoy did not direct him to work those hours, she was aware he was working more than 45 hours weekly, and that neither she nor any other superior told him he could cap his workweek at 45. Bockian Dep. 154–55, 158.

BNY emphasizes that Bockian was not required to keep to any particular schedule, a point Bockian acknowledged. Bockian Dep. 152–58. But the absence of a prescribed schedule is not tantamount to an assurance by BNY that Bockian was at liberty to cap his hours at 45 per week. A reasonable jury could distinguish between giving an employee flexibility in arranging his hours and refusing to respond to a request for a cap on weekly hours. Bockian's testimony is that he continued working beyond the requested limit because BNY never authorized him to do otherwise, notwithstanding his pending request. A jury could conclude that BNY, from the point of Bockian's request through his termination, constructively denied his request for a 45-hour

workweek. And, given the medical request, a jury could find that request reasonable (a point BNY, in seeking summary judgment, does not resist).

The record would also permit a jury to infer an intentional, as opposed to inadvertent or bureaucratic, refusal to grant the requested accommodation. The documentary evidence above reflects that BNY was affirmatively conscious of the request and discussed it in tandem with Bockian's designation for termination under the RIF. It would permit a jury to find that BNY deliberately deferred acting on the request in the belief that Bockian would soon be discharged. A jury could thus find deliberate inaction by BNY, rather than mere bureaucratic delay, enabling BNY to get the benefit of additional weekly work hours from Bockian during the final two months of his tenure. *See Tafolla*, 80 F.4th at 122–24; *Fasanello v. U.N. Int'l Sch.*, No. 19 Civ. 5281, 2022 WL 861555, at *19–21 (S.D.N.Y. Mar. 23, 2022); *Wellner*, 2019 WL 4081898, at *11. BNY's failure to act on that request, despite its ability to expressly authorize Bockian to work remotely, further supports an inference of deliberate inaction. There has also been no evidence adduced that BNY was deferring resolution of that request pending additional information, input, or procedural steps. *See Hosking v. Mem'l Sloan Kettering Cancer Ctr.*, 126 N.Y.S.3d 98, 102 (N.Y. App. Div. 2020).

Viewed in the light most favorable to Bockian, the evidence would permit a jury to find that BNY failed to accommodate his reasonable request to work a 45-hour workweek. *See, e.g.*, *Brady*, 531 F.3d at 135–36 (summary judgment properly denied on failure-to-accommodate claim where employer did not engage in interactive process); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000) ("[A]n employee who proposes an accommodation . . . at least two weeks prior to his termination—triggers a responsibility on the employer's part to investigate that request and determine its feasibility."); *Allen v. A.R.E.B.A.*

*Casriel, Inc.*, No. 15 Civ. 9965, 2017 WL 4046127, at *8 n.13 (S.D.N.Y. Sep. 12, 2017) (denying summary judgment on failure to accommodate claim where "the record suggests genuine disputes regarding Defendants' inexplicable delays in providing accommodations").

**2. Disability Discrimination**

Bockian's disability discrimination claim arises from his termination. Such claims under the ADA are also analyzed under the *McDonnell-Douglas* framework. *See, e.g.*, *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

*a.* Prima Facie *Disability Discrimination Case*

It is undisputed that Bockian has established the first three elements of his *prima facie* case: He was disabled within the meaning of the ADA, was qualified to perform the essential functions of his position, and suffered an adverse employment action. BNY Mem. at 9–13; Opp. at 7. The dispute centers on the fourth element—whether his termination occurred under circumstances giving rise to an inference of disability discrimination.

Bockian points to three categories of evidence supporting such an inference: that (1) McAvoy repeatedly touted the in-person work requirement and minimized Bockian's need for accommodations, Opp. at 7–8; (2) Bockian requested reasonable accommodations contemporaneously with his consideration for inclusion in the RIF, with BNY tabling the former in deference to the latter; *id.* at 10–14; and (3) BNY failed to accommodate Bockian or to engage in an interactive process, *id.* at 8–10.

i. McAvoy's Hostility

Bockian first cites statements by McAvoy which, he contends, supply circumstantial evidence of hostility to him on account of his disability. He notes that she termed his "desire to remain in California" a "lifestyle choice," overlooking its basis in his disability, and repeatedly expressed a preference for in-person employees. Opp. at 7–8; Bockian Dep. 120, 103–04. He

testified that, around September 2022, he discussed his long-COVID diagnosis and anticipated need for a medical accommodation with her. Bockian Dep. 116–18. His condition caused extreme fatigue, breathing difficulties, and other symptoms, and his physician had advised that regular cross-country travel was inadvisable, leading him to propose working from California as an employee of BNY's Los Angeles office. Pl. 56.1 ¶¶ 134, 148–150; Bockian Dep. 119–20. Bockian testified that McAvoy responded as follows:

> She [] appeared aghast at the suggestion. I felt like her response was hostile from the point of view of, for example, she said, Well, how do you expect me to tell the CEO that our head of funding is working from Los Angeles. . . . I asked if it would be possible to be designated as an employee of the Los Angeles office because I knew I could make it there. And she refused to consider that. She said that that was a lifestyle choice . . . . So I took that as certainly not very accommodating and somewhat hostile.

Bockian Dep. 119–20; *see also id.* at 125.

McAvoy's response is not facially discriminatory, as Bockian acknowledged. Bockian Dep. 125. But direct evidence of discriminatory intent is rare, and courts and juries commonly look to circumstantial evidence to gauge whether discrimination motivated an employment decision. *See Holcomb*, 521 F.3d at 137; *Chambers*, 43 F.3d at 37; *Tomassi*, 478 F.3d at 115–16 (observation that an older employee was "well suited" to working with senior residents revealed employer's age-based assumptions).

Here, a reasonable juror could certainly construe McAvoy as articulating a preference for in-person work or as skeptical of Bockian's sincerity given that he had previously resisted relocating to New York based on family considerations. Pl. 56.1 ¶¶ 130, 135. An employer's preference for in-person work is not inherently discriminatory. *Frantti v. New York*, 850 Fed. App'x 17, 20 (2d Cir. 2021) (summary order). But a reasonable juror alternatively could construe McAvoy's characterization of Bockian's request as a "lifestyle choice" as belittling

Bockian's diagnosed long COVID condition, about which he testified he told her. Bockian Dep. 116–18. A jury, crediting that account, could find McAvoy's characterization and resistance, including to Bockian's proposal that he affiliate with BNY's Los Angeles office, explained not by McAvoy's merits-based preference for in-person work but based on unreasoned minimization of, or disrespect for, Bockian's disability. *See Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 469–70 (2d Cir. 2019) (employer's reaction to accommodation request supported inference of discrimination even though remark did not overtly disparage disability). A jury could find that McAvoy's oft-expressed opposition to remote work, *see* Bockian Dep. 102–07; McAvoy Dep. 63, led her to disparage Bockian's disability claim as camouflaging a "lifestyle choice." A jury could construe McAvoy's subjective intent either way. *See Sassaman v. Gamache*, 566 F.3d 307, 313 (2d Cir. 2009). But viewing the evidence in the light most favorable to Bockian as the non-movant, McAvoy's statements support an inference of animus towards Bockian based on his disability, and that such informed her near-contemporaneous decision to terminate him.

ii. Termination Timeline

The chronology of Bockian's selection for the RIF also supplies circumstantial support for the inference that he was selected for termination, at least in part, based on his disability. The evidence adduced would support a jury's finding that McAvoy durably selected Bockian as a person to be terminated after she learned of his long COVID diagnosis and not long after his request for a medical accommodation. A jury that so found could find the timing probative as to McAvoy's intent in selecting him for termination.

The undisputed evidence is that Bockian began discussing a possible medical accommodation with BNY personnel well before his termination. Shortly after his diagnosis, Bockian told Friedenrich that he had long COVID and might require an accommodation. Pl. 56.1 ¶ 151. When McAvoy became Bockian's supervisor in March 2022, Bockian informed

McAvoy that he was currently working remotely from his home in California. *Id.* ¶ 157. On March 10, 2022, Gordon gave Bockian instructions for requesting an accommodation, Clark Decl., Ex. 20 at 2, and told Pell that she had discussed a "reasonable accommodation, medical" with Bockian, *id.*, Ex. 19 at 2. The next day, Pell and McAvoy discussed the discrepancy between Bockian's listing as based in New York and his being physically located in California. Clark Decl., Ex. 18 at 2; Pl. 56.1 ¶ 162; Def. 56.1 ¶ 34. Pell told McAvoy that Bockian would need to get a BAH accommodation to remain in California. Def. 56.1 ¶ 34. McAvoy also spoke about Bockian's work location with Friedenrich, who knew Bockian's diagnosis. Pl. 56.1 ¶ 164. Although McAvoy's communications with Pell and Friedenrich do not definitively establish that McAvoy herself knew of Bockian's disability as of March 2022, they would certainly give a jury a reasonable basis to so infer.

The record thereafter reflects ongoing discussions about Bockian's work arrangements. On August 30, 2022, Welch contacted McAvoy about employees with flexible arrangements who had not returned to the office. Clark Decl., Ex. 23 at 4–5. Welch encouraged McAvoy to remind such employees of BNY's hybrid-work expectations. *Id.* And Bockian testified that, in or around September 2022, he directly discussed, with McAvoy, his long-COVID diagnosis, and the possibility of a medical accommodation. Bockian Dep. 116–18.[9] He recalled that McAvoy acknowledged the point by telling him he should try to "get your accommodation." *Id.* at 123. Crediting that testimony, as the Court must on BNY's motion, a jury could find that McAvoy knew of Bockian's disability and anticipated accommodation request no later than September 2022.

[9] Bockian testified that he believed he had told McAvoy of his diagnosis earlier, but could not recall the details or date of that conversation. *Id.* at 114, 128–29.

As to the timing of the RIF decision, McAvoy's testimony was that she created the first draft of a termination list around July 2022, and selected Bockian for the RIF in August. McAvoy Dep. 104, 124, 128. But McAvoy could not find any record of an August list, despite her testimony that "I would have thought that I put it in writing." McAvoy Dep. 118. BNY, for its part, did not produce any emails, notes, calendar invitations, or other documentation tending to corroborate her claim. Clark Decl. ¶ 44. McAvoy also acknowledged that determining a final list was an "iterative process." McAvoy Dep. 127. Asked whether the final list was "the same list that you had recommended" in August, McAvoy said, "I don't remember." McAvoy Dep. 129–30. And, on October 1, 2022, when Emily Portney asked Pell to confirm with McAvoy whether Bockian "is on the list. Jan or March," Pell responded, "Sure thing. We've discussed Bockian – it is *on her mind*. Will revert." Clark Decl., Ex. 30 at 2–3 (emphasis added). This evidence would give a jury a factual basis on which to conclude that Bockian's inclusion on the list remained unsettled as of September when, Bockian testified, he informed McAvoy about his long COVID.

A reasonable juror might or might not find the close temporal proximity of events probative of McAvoy's discriminatory intent. *Grimm v. Garnet Health*, No. 21 Civ. 11056, 2024 WL 643305, at *10 (S.D.N.Y. Feb. 15, 2024). But at the *prima facie* stage, temporal proximity between an employer's awareness of a plaintiff's disability and an adverse employment action can support an inference of discrimination. *See, e.g.*, *Stryker v. HSBC Sec. (USA)*, No. 16 Civ. 9424, 2020 WL 5127461, at *9 (S.D.N.Y. Aug. 31, 2020); *Forde v. Beth Israel Med. Ctr.*, 546 F. Supp. 2d 142, 152 (S.D.N.Y. 2008). And here, on one available view of the facts, the termination closely followed not only McAvoy's awareness of Bockian's disability but also his accommodation request, which was antithetical to McAvoy's aversion to remote work. Viewed

in the light most favorable to Bockian, that evidence provides substantial support for an inference that Bockian's disability influenced his selection for the RIF.

iii. Failure to Accommodate

A final item of evidence supporting the inference of disability discrimination is BNY's refusal to accommodate Bockian's disability or even respond to his accommodation request, as reviewed above. Although a jury could view these events benignly, it could also find that BNY—per McAvoy and Pell—intentionally sat for at least two months on his request for a 45-hour cap on his workweek, despite the submission from his doctor as to its medical basis. *See, e.g., McBride*, 583 F.3d at 102; *Logan*, 57 F. Supp. 3d at 271 ("courts have held that an unreasonable delay [in granting accommodations] itself might be evidence of discriminatory intent" when such delay results from bad faith).

The three sets of evidence above—McAvoy's statements arguably evincing hostility toward Bockian's medical condition and work arrangements, the close proximity of his termination and his accommodation request, and BNY's inaction on his doctor-supported accommodation request—easily support a *prima facie* case of disability discrimination under the ADA. *See, e.g.*, *Nowlin v. Mount Sinai Health Sys.*, No. 20 Civ. 2470, 2022 WL 992829, at *11–14 (S.D.N.Y. Mar. 31, 2022) (*prima facie* case under ADA established on basis of two comments by decisionmaker that juror could view as discriminatory); *Lyman v. N.Y. & Presbyterian Hosp.*, No. 11 Civ. 3889, 2014 WL 341394, at *10–13 (S.D.N.Y. July 14, 2014) (same where timeline supported inference of discrimination); *Clark v. Jewish Childcare Ass'n*, 96 F. Supp. 3d 237, 251–52 (S.D.N.Y. 2015) (remarks suggesting management was upset about plaintiff's disability leave satisfied *prima facie* burden).

*b. Legitimate Non-Discriminatory Reason*

For the reasons addressed above in connection with Bockian's age-discrimination claim, BNY has articulated a legitimate, nondiscriminatory reason for his termination: its decision to eliminate his position as part of a companywide RIF aimed at reducing personnel expenses and improving operational efficiency. BNY's evidence to that effect equally satisfies its burden of production as to the disability discrimination claims. The burden under the ADA therefore returns to Bockian to establish that his disability was a but-for cause of his termination.

*c. Pretext and But-For Causation*

In contrast to the age-discrimination claim, the evidence Bockian has adduced would permit a reasonable jury to find that hostility to Bockian traceable to his disability was a but-for cause of McAvoy's discretionary decision to designate him for termination pursuant to the RIF. The three sets of evidence canvassed above would supply sufficient evidence on which a jury could so conclude. It could find that McAvoy's statements bespoke aversion to his remote arrangements and mockery of his medically-founded accommodation request. It could find that McAvoy knew of Bockian's medical condition at the time she first listed Bockian as a person to be terminated, and made a final decision to terminate him soon after learning of his accommodation request. And it could find that McAvoy and Pell coldly tabled his disability-based request for a cap on his weekly hours, thereby leading him to work in excess of those hours for approximately two months before he was terminated. *See Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235–36 (2d Cir. 2015) (exercise of discretion actionable where adverse employment decision is based on protected characteristic). Of course, a jury could surely find the opposite: that the termination decision had nothing to do with Bockian's COVID-19. But, viewing the evidence as a whole, and drawing all reasonable inferences in the non-movant's favor, a reasonable juror could find for Bockian here. *See Gorzynski*, 596 F.3d at 107.

### 3. Retaliation

Bockian's final federal claim relating to his disability is for retaliation under the ADA. He claims he was terminated in retaliation for his request for a medical accommodation. The *McDonnell-Douglas* burden-shifting framework also applies to this claim. To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show that "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). And, as with the ADA discrimination claim, the parties' dispute here turns on the fourth element. It is undisputed that Bockian made a request for a reasonable accommodation, and such requests, even if informal, constitute protected activity. *See Gorbea v. Verizon N.Y. Inc.*, No. 11 Civ. 3758, 2014 WL 917198, at *11 (S.D.N.Y. Mar. 10, 2014) (collecting cases); *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002). It is also undisputed that BNY was aware of the request and that its termination of him was an adverse employment action. *See Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999).

The Court's analysis as to whether a jury could infer a causal connection between the accommodation request and Bockian's termination substantially tracks its analysis as to why a jury could infer a causal connection between Bockian's disability and his termination. The evidence is sufficient both to establish the fourth element of a *prima facie* case and to rebut BNY's evidence of a legitimate non-discriminatory basis for his termination.

Briefly, the close temporal proximity between when Bockian's accommodation request was made known to McAvoy and McAvoy's subjective decision to terminate him would give a reasonable juror a sound basis from which to infer cause and effect. A juror could find those events to have occurred quite close in time—depending on the facts found, potentially within one

month. *See Gorzynski*, 596 F.3d at 110 (one month between protected activity and adverse employment action supported causal inference); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–47 (2d Cir. 2013) (three weeks); *Treglia*, 313 F.3d at 720 (one month); *Nagle v. Marron*, 663 F.3d 100, 110–11 (2d Cir. 2011) (six weeks); *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (five months is not too long to support an inference of discrimination) (collecting cases). And a jury, crediting Bockian's testimony and viewing the evidence in the light most favorable to him, could find this inference reinforced by the same evidence reviewed above: that (1) McAvoy had hostilely belittled Bockian's medically based accommodation request as a "lifestyle choice"; and (2) she and Pell had deliberately pocket-vetoed that request, viewing it as one they could moot by terminating Bockian.

The Court accordingly denies BNY's motion for summary judgment on Bockian's ADA retaliation claim. *See Treglia*, 313 F.3d at 720–21 (reversing entry of summary judgment where inferences permitted liability on retaliation claim, including based on temporal proximity of protected activity and adverse employment action); *Summa v. Hofstra Univ.*, 708 F.3d 115, 127–30 (2d Cir. 2013) (same); *Zann Kwan*, 737 F.3d at 846–47 (same).

#### 4. NYSHRL and NYCHRL Claims

The liability standards of the NYSHRL and NYCHRL on each of the disability-related claims addressed above—failure to accommodate, disability discrimination, and retaliation—are as or more protective than those of the ADA. *See Williams v. MTA Bus Co.*, 44 F.4th 115, 137 (2d Cir. 2022) (failure to accommodate); *Felix v. Bloomberg*, No. 24 Civ. 960, 2026 WL 819071, at *5 (S.D.N.Y. Mar. 24, 2026) (disability discrimination); *Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752, 2020 WL 248941, at *9 (S.D.N.Y. Jan. 16, 2020) (retaliation).

Accordingly, because the Court has sustained Bockian's ADA claims, it likewise denies BNY's motion for summary judgment on the corresponding NYSHRL and NYCHRL claims.

*See, e.g.*, *Dixon v. City of New York*, No. 23 Civ. 8941, 2025 WL 50140, at *12 (S.D.N.Y. Jan. 7, 2025) ("[A] plaintiff who states a failure-to-accommodate claim under the ADA and Rehabilitation Act necessarily states a failure-to-accommodate claim under the NYSHRL and the NYCHRL."); *Felix*, 2026 WL 819071, at *4 ("[B]ecause the NYSHRL and NYCHRL provide more lenient standards to plaintiffs alleging [disability] discrimination, the Court finds that Felix's claims under those statutes necessarily also survive summary judgment."); *Nofal v. IMCMV Times Square LLC*, No. 22 Civ. 3104, 2024 WL 1138928, at *10 (S.D.N.Y. Mar. 15, 2024) ("Because Plaintiff has introduced sufficient evidence to avoid summary judgment on the ADA retaliation claim, he has necessarily done so with respect to the NYSHRL and NYCHRL claims.").

### C. Duty to Mitigate

BNY separately moves for summary judgment on Bockian's bid for economic damages on each of the claims addressed above. It argues that the evidence establishes that he failed to mitigate his losses after his termination. BNY Mem. at 24–25.

"Victims of employment discrimination are required to mitigate their damages." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998). A discharged employee must exercise "reasonable diligence in finding other suitable employment," although that employment need not be comparable in every respect to the employee's former position. *Id.* (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231–32 & 231 n.15 (1982)). The duty to mitigate, however, "is not onerous," and an employee need not succeed in obtaining alternative employment to satisfy it. *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998).

The employer bears the burden of establishing a failure to mitigate. It ordinarily must demonstrate both that (1) suitable alternative employment was available and (2) the employee failed to exercise reasonable diligence in seeking it. *Dailey v. Societe Generale*, 108 F.3d 451,

456 (2d Cir. 1997) (citing *Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992)). BNY has not attempted to show the first of these: that suitable alternative employment was available to Bockian. Its motion for summary judgment instead seizes on a limited exception the Second Circuit has recognized, under which an employer need not establish the availability of suitable employment if it can prove that the employee "made no reasonable efforts to seek such employment." *Greenway*, 143 F.3d at 54. The employer must show that, viewing the evidence in the light most favorable to the plaintiff, a reasonable jury would have to find that the plaintiff made no reasonable efforts to seek employment. *Broadnax v. City of New Haven*, 415 F.3d 265, 268–70 (2d Cir. 2005); *Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 312 (S.D.N.Y. Aug. 28, 2009); *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 580 (S.D.N.Y. 2010).

The evidence adduced does not enable BNY to clear that bar on summary judgment. Crediting Bockian's testimony, it reflects that his job search was limited, but not nonexistent. Bockian testified that, within approximately two weeks of his termination, he spoke with the chief strategist at Société Générale, who told him she would consult her contacts concerning potential opportunities. Bockian Dep. 225. He also contacted close friends about employment opportunities, reviewed LinkedIn postings and the JJ Alerts website several times per week, and spoke with a recruiter on one or two occasions. *Id.* at 226–28. Additionally, Bockian contacted the CFO of Wells Fargo Bank concerning a position he considered a "perfect fit." *Id.* at 229. And he attempted to pursue other openings but discovered that they had already been filled. *Id.* at 228. As of his deposition, Bockian was pursuing a potential position with the California State Retirement System, although he did not testify that he had submitted an application. *Id.* at 231.

To be sure, Bockian's job-seeking efforts, as he described them, were modest. These consisted "primarily" of contacting individuals and reviewing LinkedIn postings. *Id.* at 228. He

could not identify a completed formal job application or produce documentary evidence of any application submitted to a prospective employer. *Id.* at 228–31. He did not secure any interview or chronicle efforts to follow up with leads his professional contacts identified.

But, viewing the evidence in the light most favorable to Bockian, a reasonable jury could find that he made reasonable efforts to seek employment. Bockian had occupied a senior post in the financial-services industry. A jury could find that, given his role and experience, networking with senior banking executives, contacting a recruiter, and regularly reviewing professional job postings were the most efficacious means to identify suitable opportunities. A jury could find that the absence of a formal job application did not establish the absence of reasonable efforts. *See, e.g.*, *EEOC v. Kallir, Philips, Ross Inc.*, 420 F. Supp. 919, 925–26 (S.D.N.Y. 1976) ("Defendant has not shown that plaintiff was not active in her *efforts*" (emphasis added)).

*Mihalik v. Credit Agricole Chevreux N. Am.*, on which BNY relies, is not to the contrary. The Court there found insufficient an employee's vague and general testimony that she had contacted a recruiter, reviewed job listings, and spoken with former colleagues, without pursuing particular positions. No. 09 Civ. 1251, 2015 WL 13699239, at *3 (S.D.N.Y. Mar. 25, 2015). A reasonable jury could view Bockian's efforts, as he recounted them, as more concrete and substantial. He identified particular senior executives he had contacted, described a specific position at Wells Fargo he had pursued, and recounted reviewing LinkedIn postings several times each week. Bockian Dep. 225–31.

A reasonable jury could find these efforts and outreach sufficient to satisfy his duty to mitigate. *See Hawkins*, 163 F.3d at 695; *e.g.*, *Harison v. Indosuez*, 6 F. Supp. 2d 224, 235 (S.D.N.Y. 1998) (finding "some reasonable efforts" where former employee mailed resumes to banks, spoke with personal contacts, and utilized a directory to find leads on potential

employers); *Arbercheski*, 650 F. Supp. 2d at 313–14 (same where former employee interviewed for one position and had limited conversations regarding others); *Sharkey v. J.P. Morgan Chase & Co.*, No. 10 Civ. 3825, 2018 WL 1229831, at *10–11 (S.D.N.Y. Mar. 5, 2018) (same where former employee contacted recruiters and reached out to industry contacts). This issue is properly for the jury. The Court accordingly denies BNY's motion for summary judgment on its failure-to-mitigate defense.

**D. BNY's RSU-Based Counterclaims**

BNY seeks summary judgment on its counterclaims. In one, it seeks to recover the value of RSUs it erroneously distributed to Bockian after his termination. BNY is entitled to summary judgment to the extent that counterclaim sounds in unjust enrichment. In another, BNY seeks to recover the value of RSUs it had issued to Bockian before his termination, on the ground that Bockian, by bringing his claims of discrimination, breached the Award Agreements and forfeited his right to such relief. BNY is not entitled to summary judgment on that counterclaim.

**1. The Unvested RSUs Issued to Bockian Post-Termination**

The material facts are largely undisputed. Bockian received RSU awards pursuant to annual Award Agreements, subject to Terms and Conditions, JSF ¶¶ 22–24, of which Bockian was on notice, Bockian Dep. 203, 210, and, in signing, confirmed he had reviewed. Ferrante Decl., Ex. A at 2. Bockian testified that he had not understood that his RSUs would cease vesting upon termination, but he admitted that he had agreed to the terms of the awards that so provided and that he had never seen a document stating that his RSUs would continue to vest after termination. Bockian Dep. 202–03, 210.

The Terms and Conditions expressly conditioned vesting on employment through the applicable vesting date. JSF ¶ 24. Section 2.1(b), entitled "Forfeiture upon Termination of Employment," stated that, if the employee ceased to be continuously employed by BNY before

RSUs became fully vested, he would "cease vesting in [his] RSUs as of [his] Termination Date" and any unvested RSUs, including associated dividend equivalent rights, would "immediately . . . terminate" and be "forfeited." Terms and Conditions at 5–6. It thus made forfeiture of unvested RSUs automatic and immediate upon termination of employment, subject to exceptions not applicable here.[10]

Bockian's employment ended on January 29, 2023. Def. 56.1 ¶ 113. He did not execute a release agreement that, under a provision of the Terms and Conditions, would have permitted him to retain certain otherwise forfeitable awards. Gordon Decl. ¶ 8.[11] Accordingly, under § 2.1(b), his unvested RSUs were forfeited as of his termination date. Nevertheless, in February 2023, BNY distributed to Bockian shares attributable to RSUs that had not vested before his

---

[10] For example, RSUs subject to a pending risk-adjustment determination were not immediately terminated. Section 2.1(b) deferred such termination, and preserved the possibility of vesting, until a committee had acted:

> [H]owever, if the Risk Adjustment Process applies to your award . . . in situations where vesting would have otherwise occurred but for the fact that a determination has not yet been made as to whether a risk adjustment pursuant to Exhibit A is required, vesting shall occur in accordance with the terms of the Award Agreement provided that the Committee determines the effect, if any, of any risk adjustment.

Terms and Conditions at 5–6.

[11] Section 2.2(b) read:

> If you cease to be continuously employed with your Employer (i) on or after your attainment of age 60 and (ii) the combination of your age and years of credited employment with your Employer (in both instances, full and partial years) on your Termination Date equals or exceeds 65 . . . you will continue to vest in your RSUs . . . so long as you fully comply with the applicable covenants provided in Section 3 hereof and provided that, if requested by your employer . . . *you execute and do not revoke a Transition/Separation Agreement and Release* acceptable to your Employer.

Terms and Conditions at 7 (emphasis added).

termination. Ferrante attested—without refutation—that the distribution had been inadvertent. Ferrante Decl. ¶ 10. Bockian later sold the shares and received approximately $300,000 in proceeds. Bockian Dep. 212.

Bockian does not identify any contractual provision entitling him to retain the unvested RSUs issued to him after his termination. Instead, he argues that BNY lacks authority to demand repayment because § 5.4 of the Terms and Conditions confines BNY's discretion to specified grounds for forfeiture and repayment. Opp. at 20. That interpretation overlooks § 2.1(b), which governs the automatic forfeiture of unvested RSUs upon termination of employment. Nothing in Section 5.4, which identifies additional circumstances in which BNY may cancel awards or require repayment, displaces the automatic forfeiture provision or makes forfeiture of unvested RSUs upon termination contingent on a discretionary determination under § 5.4. And Bockian's reading would render § 2.1(b) substantially ineffective. "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (cleaned up).

Bockian separately argues that BNY waived its right to recover the mistakenly distributed shares by waiting approximately two years before seeking repayment. Opp. at 21 & n.20. Under New York law, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006); *see also Christian Dior-N.Y., Inc. v. Koret, Inc.*, 792 F.2d 34, 40 (2d Cir. 1986). Such abandonment may be established through affirmative conduct or a failure to act that evinces an intention to relinquish the contractual right. *See Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995). But

waiver "should not be lightly presumed" and requires a "clear manifestation of intent" to relinquish the contractual protection. *Fundamental Portfolio Advisors*, 850 N.E.2d at 658.

Bockian has not identified evidence from which a reasonable jury could find such an intentional relinquishment. He relies on the fact that two years passed between when BNY distributed the shares and when it asserted a right to repayment. But the passage of time does not establish that BNY knew the distribution was erroneous yet intended to permit Bockian to keep the proceeds. The undisputed evidence is that the distribution was inadvertent and unintentional. Ferrante Decl. ¶ 10. And Bockian does not have evidence that BNY discovered the error earlier than it claims, Bockian Dep. 214, nor identify conduct by BNY evincing an intent to relinquish a right to recover the errantly distributed RSUs. Such evidence is needed to establish that BNY knowingly abandoned its rights. *See Fundamental Portfolio Advisors*, 850 N.E.2d at 657–58; *Gen. Motors Acceptance Corp.*, 647 N.E.2d at 1331. The Court thus rejects Bockian's waiver defense.

The undisputed evidence therefore establishes that the unvested RSUs erroneously issued to Bockian had automatically forfeited upon his termination; that Bockian did not have any right to them; and that BNY did not waive its right to seek their recovery.

BNY pursues recovery of these shares based both on a claim of contract breach and a claim of unjust enrichment. BNY's contract-breach claim is problematic in that, although § 2.1(b) provides (subject to exceptions not present here) for the automatic forfeiture upon termination of unvested shares previously issued, it is silent as to an obligation to return RSUs inadvertently distributed later, and BNY does not identify any other contractual provision ostensibly imposing on the recipient an affirmative repayment obligation in this circumstance.

BNY's unjust enrichment claim—seeking from Bockian value of the shares it mistakenly distributed to him—is, however, clearly meritorious. Under New York law, a plaintiff asserting unjust enrichment must establish "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). The essence of the claim is that one party received a benefit at another's expense under circumstances making retention of that benefit inequitable. *Kaye*, 202 F.3d at 616.

To be sure, a party cannot ordinarily recover in unjust enrichment where a valid and enforceable agreement governs the particular subject matter of a dispute. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). But the principle that unjust enrichment cannot duplicate a binding contract does not carry the day here, because the Award Agreements do not speak to the idiosyncratic issue here: the mechanism by which BNY can reclaim the value of RSUs it erroneously issued to a former employee. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009). "[F]or a contract to cover the dispute in issue and thus bar a plaintiff's [unjust enrichment] claims, the contract must specifically address the actions that gave rise to the dispute. That is to say, the contract must clearly cover the dispute between the parties." *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 338 (S.D.N.Y. 2023); *see also Pall Corp. v. CleanSpace Modular, LLC*, No. 23 Civ. 2082, 2023 WL 7412096, at *7–8 (S.D.N.Y. Nov. 9, 2023) (unjust enrichment claim not duplicative where contract did not clearly address subject of the dispute); *Delshah 60 Ninth, LLC v. Free People of PA LLC*, 175 F.4th 192, 200–01 (2d Cir. 2026) (reviving unjust enrichment claim where no provision of the contract governed party's obligation

to reimburse overpayment); *Pauwels v. Deloitte LLP*, 83 F.4th 171, 187–88 (2d Cir. 2023) (reviving unjust enrichment claim where contract did not contemplate the dispute at issue).

And the undisputed facts establish the elements of unjust enrichment here. Bockian, the counterclaim defendant, does not dispute that he was issued the RSUs in error and that any claim he had to these had been forfeited upon his termination. Ferrante Decl. ¶ 10; Bockian Dep. 212. He thus benefited from this error at the expense of BNY, the counterclaim plaintiff. And he does not make any argument why equity and good conscience permit him to retain the RSUs (or, following their sale, the value of them). BNY is therefore entitled to recover the value of the RSUs. *See, e.g.*, *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) ("Typical cases [of unjust enrichment] are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled."); *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790 N.Y.S.2d 84, 85 (N.Y. App. Div. 2005) ("There is a long-established principle that money paid under mistake of material fact may be recovered, unless the party resisting repayment can demonstrate that its position has so changed by reason of the payment as to make repayment inequitable."); *Banque Worms v. BankAmerica Int'l*, 570 N.E.2d 189, 191 (N.Y. 1991) (payments made under a mistake of fact are generally recoverable, absent detrimental reliance or another applicable defense).[12]

**2. BNY's Claim That This Lawsuit Breaches the RSU Agreement**

In a counterclaim sounding in breach of contract, BNY separately claims that Bockian breached the RSU Award Agreements by bringing this lawsuit and seeking damages for his unlawful termination that would make him whole for the RSUs he forfeited upon termination. It

---

[12] The Court will not, however, enter judgment on this claim, directing repayment, at this stage. If Bockian prevails at trial on one or more of his surviving claims, his relief may encompass the value of RSUs that, but for his termination, he would have received. It is sensible to assess damages holistically, following a resolution of all claims.

bases this claim on § 5.6(e) of the Terms and Conditions, which provides that "[n]o claim or entitlement to compensation or damages shall arise from forfeiture of the RSUs resulting from the termination of your employment or other service relationship," even if the termination is later found unlawful. Terms and Conditions at 13. It further provides that, in consideration of the RSU grant, the employee agrees not to "institute any such claim" against BNY or its affiliates. *Id.* at 14. BNY claims that Bockian breached that provision by seeking damages in this action that would encompass the RSUs Bockian forfeited upon termination. For that breach, BNY seeks wide-ranging damages, including the value of vested *and* unvested RSUs, and attorneys' fees. Answer ¶¶ 63–66.

The Court declines to enter summary judgment for BNY on that claim of contract breach. Bockian's lawsuit seeks to vindicate rights conferred by federal, state, and local civil-rights laws prohibiting discrimination on the basis of protected characteristics. The Court has sustained these claims to the extent based on Bockian's disability. Those statutes authorize employees to recover appropriate relief for unlawful discrimination, including recovery of compensation and benefits lost as a result of the employer's illegal actions. BNY's deployment of § 5.6(e) here would punish Bockian for exercising those legal rights, including denying him relief to which, if he prevails at trial on his claims of liability and consequent damages, he is statutorily entitled.

BNY's bid would thus impermissibly penalize the exercise of statutory rights. An employer cannot, by private agreement, deprive an employee of the right to pursue statutory discrimination claims and the remedies available for their violation. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51–52 (1974); *DeGaetano v. Smith Barney, Inc.*, 983 F. Supp. 459, 468–70 (S.D.N.Y. 1997) (employment arbitration provision barring prevailing Title VII plaintiff from recovering attorney's fees void as against public policy because it deprived plaintiff of

principal statutory remedy). Nor may an employer accomplish indirectly, through a contractual forfeiture or clawback provision, what it could not accomplish through an express prohibition on bringing suit. *See Richardson v. Comm'n on Hum. Rts. & Opportunities*, 532 F.3d 114, 120–22 (2d Cir. 2008) (civil-rights statutes ensure access to statutory remedial mechanisms); *EEOC v. Bd. of Governors of State Colls. & Univs.*, 957 F.2d 424, 429–31 (7th Cir. 1992) (contractual provision terminating grievance proceedings upon employee's filing of discrimination charge violated ADEA's antiretaliation protections). That § 5.6(e) is framed as a limitation on claims to the extent they seek equity forfeited as a result of unlawful discrimination, rather than as a general prohibition on discrimination litigation, does not eliminate the problem.

The Court therefore denies BNY's motion for summary judgment on its counterclaim based on § 5.6(e). If Bockian prevails in this lawsuit, § 5.6(e) cannot strip him of remedies to which he is statutorily entitled.

### 3. Bockian's Challenge to the Counterclaims as Improper Retaliation

Bockian argues that BNY brought its counterclaims in retaliation for his bringing this lawsuit. Although this argument is framed as a basis to oppose BNY's motion for summary judgment on the counterclaims, the Court construes it as seeking dismissal of the counterclaims as illegally retaliatory. The Court rejects this argument.

Counterclaims are commonly brought, including in cases where a plaintiff has claimed unlawful discrimination. The assertion of a counterclaim does not establish unlawful retaliation merely because it follows the filing of such a suit. Courts instead require evidence that a counterclaim alleged to be retaliatory was baseless and brought in bad faith. *See, e.g.*, *Figueroa-Torres v. Kleiner*, No. 20 Civ. 4851, 2022 WL 768483, at *10 n.10 (S.D.N.Y. Mar. 14, 2022); *Ebel v. G/O Media, Inc.*, No. 20 Civ. 7483, 2022 WL 2359245, at *25 (S.D.N.Y. June 30, 2022); *also Sherman v. Fivesky, LLC*, No. 19 Civ. 8015, 2020 WL 5105164, at *6 (S.D.N.Y. Aug. 31,

2020) ("The courts in this District have repeatedly held that '[a] compulsory counterclaim is not actionable for retaliation unless it is totally baseless.'" (quoting *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 474 (S.D.N.Y. 2008))); *Arevalo v. Burg*, 10 N.Y.S. 3d 231, 231 (N.Y. App. Div. 2015) ("It is the rare case that the filing of a counterclaim can serve as the basis for a retaliation claim." (citation omitted)).

Here, BNY's counterclaims are not baseless. Its first one, seeking return of erroneously distributed RSUs on a theory of unjust enrichment, has been found meritorious. Its second one, seeking forfeiture of RSUs based on the bringing of this lawsuit, has a basis in contract, even though it will be unenforceable if Bockian prevails on his statutory discrimination claims. And Bockian has not adduced evidence of retaliatory intent. Asked to identify the basis for his claim that BNY's counterclaims were retaliatory, he cited only "[t]he fact that they're suing me" and that BNY did not do so before he commenced this litigation. Bockian Dep. 213–14. But BNY persuasively maintains that it had not been aware of the mistakenly distributed RSUs before Bockian filed an EEOC complaint and did not have a basis to invoke § 5.6(e) before this lawsuit was filed, and that it now has a legitimate basis to seek recovery of the mistakenly distributed RSUs. *See, e.g.*, *Ozawa v. Orshini Design Assocs., Inc.*, No. 13 Civ. 1282, 2015 WL 1055902, at *10–11 (S.D.N.Y. Mar. 11, 2015) (where counterclaim "constitutes a valid attempt to exercise . . . legal rights," plaintiff's retaliation claim may be barred as a matter of law); *Conahan v. MedQuest Ltd.*, No. 20 Civ. 1325, 2022 WL 16748585, at *11 (S.D.N.Y. 2022) ("[An] employer should not be required to forfeit a potentially meritorious claim against its employee simply because the employee has brought a claim against the employer." (citation omitted)); *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 342–43 (S.D.N.Y. 2009)

(employer's assertion of a legitimate claim against an employee does not constitute retaliation merely because the employee previously complained of discrimination).

*Milazzo v. Bank of New York Mellon Corp.*, No. 23 Civ. 5437 (AS), Dkt. 108 (S.D.N.Y. Oct. 15, 2025), on which Bockian relies, does not assist his challenge to the counterclaims. There, a different former BNY employee alleged that BNY's efforts to recover unvested RSUs were retaliatory. *Id.* at 2. The court rejected the retaliation claim, finding that BNY's counterclaim was neither baseless nor brought in bad faith. *Id.* at 3.

The Court accordingly denies Bockian's challenge to the counterclaims.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part BNY's motion for summary judgment.

The Court grants BNY's motion as to Bockian's claims of age discrimination, in violation of the ADEA, NYSHRL, and NYCHRL.

The Court denies BNY's motion as to Bockian's (1) failure to accommodate claims, in violation of the ADA, NYSHRL, and NYCHRL, while narrowing those claims to BNY's failure to accommodate his request for a 45-hour workweek; (2) disability discrimination claims, in violation of the ADA, NYSHRL, and NYCHRL; (3) retaliation claims, in violation of the ADA, NYSHRL, and NYCHRL; and (4) claims for economic damages.

As to BNY's counterclaims, the Court (1) grants summary judgment to BNY on its counterclaim of unjust enrichment, to the extent based on Bockian's retention and liquidation of approximately $300,000 in unvested RSUs that BNY erroneously issued to him upon termination; and (2) denies summary judgment on BNY's counterclaim for recovery of other RSUs, which BNY claims Bockian forfeited by bringing this lawsuit.

The Court respectfully directs the Clerk of Court to close the motions pending at Dockets 50 and 59.

This case will now proceed to trial. An order will issue shortly as to next steps, including setting a deadline for the parties' joint pretrial order and accompanying submissions. The Court will contact counsel shortly about scheduling a trial in the spring.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 9, 2026
New York, New York